# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| PATRICIA SUE THOMAS, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17cv00052 |
| | ) | **MEMORANDUM OPINION** |
| NANCY A. BERRYHILL, | ) | |
| **Acting Commissioner of** | ) | By:  PAMELA MEADE SARGENT |
| **Social Security,** | ) |       United States Magistrate Judge |
|     Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Patricia Sue Thomas ("Thomas"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties, pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Thomas protectively filed her applications for DIB and SSI on September 16, 2013, alleging disability as of August 1, 2014[1], due to panic attacks, anxiety, depression, obsessive compulsive disorder, back injury, restless leg syndrome, arthritis, a heart condition, vertigo, bladder problems and thyroid problems. (Record, ("R."), at 16, 216-17, 221-27, 244, 279-80.) The claims were denied initially and upon reconsideration. (R. at 73-81, 83-98, 100-15, 120-22, 127-29, 133, 135-37, 139-44, 146-48.) Thomas then requested a hearing before an ALJ. (R. at 149-50, 173-74.) The ALJ held a hearing on October 26, 2016, at which Thomas was represented by counsel. (R. at 36-61.)

By decision dated January 27, 2017, the ALJ denied Thomas's claims. (R. at 16-30.) The ALJ found that Thomas met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2016.[2] (R. at 18.) The ALJ found that Thomas had not engaged in substantial gainful activity since March 1, 2011, the alleged onset date.[3] (R. at 18.) The ALJ found that the medical evidence established that Thomas had severe impairments, namely degenerative

---

[1] Thomas amended her alleged onset date to August 1, 2014, at her hearing before the ALJ. (R. at 39-40.)

[2] Therefore, Thomas had to show that she was disabled between August 1, 2014, the alleged onset date, and March 31, 2016, the date last insured, in order to be eligible for DIB benefits.

[3] The ALJ made this finding despite stating that Thomas amended her alleged onset date to August 1, 2014, at the hearing. (R. at 16, 39-40.)

disc disease of the lumbar and thoracic spines, anxiety disorder, depressive disorder, obsessive-compulsive disorder and borderline intellectual functioning, but he found that Thomas did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-22.) The ALJ found that Thomas had the residual functional capacity to perform medium work[4] that did not require more than frequent postural activities. (R. at 22-28.) The ALJ also found that Thomas could understand, remember and carry out simple instructions and perform simple, routine tasks with occasional interaction with others and occasional changes in a routine work setting. (R. at 22.) The ALJ found that Thomas was unable to perform her past relevant work. (R. at 28-29.) Based on Thomas's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Thomas could perform, including jobs as a cleaner, a laundry worker and a hand packager. (R. at 29-30.) Thus, the ALJ concluded that Thomas was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2018).

After the ALJ issued his decision, Thomas pursued her administrative appeals, (R. at 212), but the Appeals Council denied her request for review. (R. at 1-5.) Thomas then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2018).

404.981, 416.1481 (2018). This case is before this court on the Commissioner's motion for summary judgment filed August 24, 2018.[5]

## II. Facts

Thomas was born in 1964, (R. at 40, 216, 241), which classified her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d) at the alleged onset of disability. Thomas completed the ninth grade in school and has past work in a nursing home, a sewing factory and a hotel. (R. at 41-42, 269.) Thomas testified that she experienced pain in the middle part of her back going all the way down into her legs and feet. (R. at 44.) Thomas said that she could stand, at most, for 15 minutes before having to sit down. (R. at 45.) She said that she could not walk 100 feet without stopping and that, at most, she could lift 15 pounds. (R. at 45-46.) Thomas said that her average pain level on medication was a 9 on a 10-point pain scale. (R. at 46-47.) Thomas said that stressful situations caused her anxiety. (R. at 47.) Thomas said that she did not like to be around crowds. (R. at 47-48.) Thomas said that she had problems getting along with co-workers and supervisors. (R. at 48.)

Mark Hileman, a vocational expert, was present and testified at Thomas's hearing. (R. at 55-61.) Hileman was asked to consider a hypothetical individual of Thomas's age, education and work history, who had the residual functional capacity to perform medium work with frequent postural activities, who is able to understand, remember and carry out simple instructions and perform simple

---

[5] Thomas did not file a motion for summary judgment. Instead, she filed a Memorandum In Support Of Plaintiff's Request To Remand Back To The Social Security Administration. (Docket Item No. 20.)

routine tasks with occasional interaction with others and who is able to adapt to occasional simple changes in the routine workplace setting. (R. at 56-57.) Hileman stated that such an individual could perform Thomas's past work as a housekeeping cleaner and could perform other jobs that existed in significant numbers in the national economy, including those as a cleaner II, a laundry worker and a hand packager. (R. at 57-58.) Hileman stated that, if the individual could not maintain concentration and persist for two-hours periods during the workday, there would be no work she could perform. (R. at 59-60.) Hileman also stated that, if the individual would miss two or more days of work a month, there would be no work she could perform. (R. at 60.)

In rendering his decision, the ALJ reviewed records from Richard J. Milan, Jr., Ph.D., a state agency psychologist; Eric Oritt, a state agency psychologist; Dr. Joseph Familant, M.D., a state agency physician; Dr. R. S. Kadian, M.D., a state agency physician; Dr. James Louthan, M.D.; Dr. Curtis Jantzi, D.O.; Holston Medical Group; Indian Path Medical Center; and Christopher M. Carusi, Ph.D., a licensed clinical psychologist.

Dr. Curtis Jantzi, D.O., with Holston Medical Group, treated Thomas from at October 2011 to October, 2012. (R. at 367-94, 400-23.) On her initial visit with Dr. Jantzi on October 5, 2011, Thomas informed him that she was filing for disability benefits due to back pain. (R. at 420.) Thomas gave Dr. Jantzi a history of generalized anxiety with occasional panic attacks and obsessive-compulsive disorder, chronic low back pain and hypothyroidism. (R. at 420.) Dr. Jantzi noted that spine x-rays showed mild degenerative changes at the T6-7 and T7-8 levels. (R. at 420.) Dr. Jantzi noted the Thomas exhibited a normal gait and normal movements of all extremities, normal muscle strength and tone with tenderness to

palpation of the thoracic and lumbar paraspinal muscles and negative straight leg raises bilaterally. (R. at 422.)

On November 7, 2011, Dr. Jantzi noted that a recent MRI of Thomas's lumbar spine showed no specific degenerative disc disease or stenosis. (R. at 413.) He stated that Thomas's pain was due to muscle spasm/strain, and he was referring Thomas to physical therapy and prescribing muscle relaxer and anti-inflammatory medication. (R. at 413.) He also noted that Zoloft was working well for Thomas's complaints of anxiety and obsessive-compulsive disorder. (R. at 413.) On February 6, 2012, Thomas requested that her dosage of Zoloft be increased. (R. at 405.) Dr. Jantzi noted normal affect and mood, normal gait, movement of extremities, muscle strength and tone, with negative straight leg raises bilaterally and tenderness to palpation of the thoracic and lumbar paraspinal muscles. (R. at 407.)

On April 24, 2012, Thomas complained of persistent anxiety even with taking Zoloft and increased heart rate. (R. at 392.) She also complained of back pain and stiffness. (R at 392.) Dr. Jantzi noted that Thomas exhibited a normal gait, normal movements of all extremities, normal muscle strength and tone, negative straight leg raises bilaterally and tenderness on palpation of the thoracic and lumbar paraspinal muscles. (R. at 394.) He also noted normal mood and affect. (R. at 394.) Thomas saw Dr. Jantzi again on March 27, 2012, with similar complaints and findings. (R. at 400-03.)

Thomas saw Nancy Pace, a family nurse practitioner with Holston Medical Group, on June 14, 2012, for complaints of right leg pain and spasms preventing sleep. (R. at 383-85.) Pace noted that Thomas was in no acute distress, she had a regular heart rate, reflexes were 2/4, and muscle strength was 4/5 in all four

extremities with intact sensation and no edema. (R. at 384.) Thomas saw Dr. Jantzi again on June 20, 2012. (R. at 377-81.) Thomas complained of pain and swelling in her feet and cramps and restless legs at night. (R. at 377.) Thomas said her anxiety and obsessive-compulsive disorder seemed to be controlled on Zoloft. (R. at 377.) Dr. Jantzi noted that Thomas exhibited a normal gait and normal movement of all extremities, as well as normal muscle strength and tone. (R. at 379.) He also noted that straight leg raises were negative bilaterally, and there was tenderness to palpation of Thomas's thoracic and lumbar paraspinal muscles. (R. at 379.) Thomas saw Dr. Jantzi for follow up on July 23 and October 23, 2012, with similar complaints and findings (R. at 367-74.) In July 2012, Thomas reported that her restless leg syndrome was well-controlled on medication. (R. at 371.)

Dr. James Louthan, M.D., with Holston Medical Group, started treating Thomas on December 17, 2012, for hypothyroidism, increased depression and hyperlipidemia. (R. at 361-64.) Dr. Louthan noted that Thomas was in no acute distress, and he noted no complaints of back pain. (R. at 361-64.) On January 17, 2013, Thomas complained of back pain. (R. at 354.) Dr. Louthan noted that Thomas's musculoskeletal, neurological and psychiatric examinations were all negative. (R. at 356.) He also noted that Thomas had a normal gait, affect and mood. (R. at 356.) X-rays of Thomas's thoracic spine showed mild degenerative disc disease. (R. at 366.)

On February 15, 2013, Dr. Louthan saw Thomas for follow up for back pain, and he noted that she was "asymptomatic." (R. at 351.) On May 10, 2013, Dr. Louthan saw Thomas for back pain, hyperlipidemia, hypertension and hyperthyroidism. (R. at 347-49.) Dr. Louthan noted that Thomas's blood pressure

and hypothyroidism was doing well. (R. at 347.) He also noted that Thomas's hyperlipidemia was then "asymptomatic." (R. at 347.)

On October 15, 2013, Dr. Louthan saw Thomas for complaints of worsened back pain, which moved into her right hip/leg, and increased anxiety. (R. at 342-45.) Dr. Louthan stated that his examination of Thomas's lumbar/sacral spine revealed no visible abnormalities, normal lordosis, no scoliosis, no spine tenderness on palpation, full range of motion and no pain with motion in any direction. (R. at 344.) He also noted that all motor groups, sensory exam and all reflexes were within normal limits. (R. at 344.) Dr. Louthan diagnosed lumbar radiculopathy, anxiety disorder and hypothyroidism. (R. at 344.)

On January 10, 2014, state agency psychologist, Richard J. Milan, Jr., Ph.D., completed a Psychiatric Review Technique, ("PRT'), on Thomas. (R. at 78-79.) According to Milan, Thomas's impairments did not meet or equal the listed impairments found at § 12.04 for affective disorders or § 12.06 for anxiety-related disorders. (R at 79.) Milan stated that Thomas had been diagnosed with an anxiety disorder, depression and obsessive-compulsive disorder by her primary care physician based on her history. (R. at 79.) Milan said that Thomas's conditions were well-controlled on Cymbalta. (R. at 79.) Milan stated that Thomas's mental impairment was not severe and posed no more than mild restriction on her activities of daily living and mild difficulties in maintain social functioning. (R. at 79.)

Based on his review of the medical evidence, Dr. Joseph Familant, M.D., a state agency physician, stated that Thomas did not have a severe physical impairment on January 10, 2014. (R. at 78.) On August 21, 2014, Dr. R. S. Kadian,

M.D., a state agency physician, stated that Thomas did not suffer from a severe physical impairment. (R. at 108.)

On January 16, 2014, Thomas complained of worsened depression and worsened back pain to Dr. Louthan. (R. at 478.) Thomas saw Dr. Louthan on January 30, 2014, for trouble urinating. (R. at 467-70.) Dr. Louthan referred Thomas for a gynecological consult. (R. at 469.) Thomas was seen at Indian Path Medical Center emergency department on February 8, 2014, for a urinary tract infection and prolapsed bladder. (R. at 435-38.) Thomas saw Dr. Chadi Jarjoura, M.D., an obstetrician/gynecologist with Holston Medical Group, regarding her prolapsed bladder on February 11, 2014, (R. at 462-66.) Thomas complained of pelvic pain and gave a history of having undergone a hysterectomy 15 years earlier. (R. at 462.) Thomas gave a history of no stress incontinence of her bladder. (R. at 462.) Dr. Jarjoura noted that Thomas's bladder was normal upon palpation, and a genitourinary examination was normal. (R. at 464.) Dr. Jarjoura diagnosed prolapse of vaginal vault after hysterectomy. (R. at 464.) Dr. Jarjoura saw Thomas again on February 27, 2014. (R. at 457-60.)

Thomas returned to Dr. Louthan on April 17, 2014, with complaints of fatigue and lower back pain. (R. at 448-51.) Thomas also complained of worsened depression since her last visit. (R. at 448.) Dr. Louthan noted that Thomas's spinal examination revealed no visible abnormalities, normal lordosis, no scoliosis, no spine tenderness on palpation, full range of motion and no pain on motion in any direction. (R. at 450.) He noted that all motor groups, sensory exam and reflexes were within normal limits. (R. at 450.) He did note that Thomas's mood and affect were depressed. (R. at 450.)

On July 17, 2014, Dr. Louthan noted that Thomas came in to get a refill of her Lortab prescription and to talk about getting disability benefits. (R. at 487-90.) She complained of worsened depression and loss of energy. (R. at 487.) Thomas also complained of worsened back pain and said she was doing "poorly." (R. at 487.) Dr. Louthan noted that Thomas was in no acute distress. (R. at 488.) The record of this visit does not reflect that Dr. Louthan conducted any examination of Thomas's back or lumbar spine. (R. at 487-90.)

Dr. Louthan completed a Medical Source Statement (Physical) on Thomas on July 18, 2014. (R. at 492-93.) On this form, Dr. Louthan stated that Thomas suffered from "severe" back pain with nerve involvement, chronic depression and fatigue. (R. at 492.) Dr. Louthan stated that Thomas could not be reasonably expected to work an eight-hour day, 40-hour workweek, on a regular basis without missing more than two days a month. (R. at 492.) Dr. Louthan stated that Thomas had no limitation on her ability to sit, but was limited in her ability to stand, to walk, to stoop and to climb, but he did not say to what extent. (R. at 492.) He stated that Thomas could frequently lift/carry items weighing up to 5 pounds and occasionally lift/carry items weighing up to 10 pounds. (R. at 492.) He said that Thomas could frequently use her hands for fine and gross manipulation and occasionally raise her arms over shoulder height. (R. at 492.) Dr. Louthan stated that Thomas had "a reasonable medical need to lie down due to pain, fatigue, or other impairment" for two to three hours at a time, two to three times a day. (R. at 493.)

On October 15, 2014, Christopher M. Carusi, Ph.D., a licensed clinical psychologist, performed an consultative psychological evaluation of Thomas at the state agency's request. (R. at 495-97.) Carusi noted that Thomas was well-groomed

and walked without gait disturbance. (R. at 495.) He noted that she was cooperative and responsive with no significant evidence of psychomotor retardation or agitation. (R. at 495.) Thomas alleged disability due to "I don't know if it's the stress or the mental part" (R. at 495.) Thomas stated that her problems with anxiety and depression began when she divorced her first husband and had to raise her two children on her own. (R. at 495.) Thomas reported that she quit school in the ninth grade and that she received special education services in math. (R. at 496.) Thomas stated that she last worked four years earlier as a housekeeper at a motel; she stated that she also had worked previously as a certified nursing assistant. (R. at 496.) Thomas claimed that she did not get along well with co-workers or some supervisors. (R. at 496.) She said, "I would just get too stressed out and aggravated." (R. at 496.)

Thomas stated that she performed her own activities of daily living, but spent much of her time watching television or just "sitting around." (R. at 496.) She claimed that she seldom left her house and sometimes spent several days in her pajamas. (R. at 496.) Carusi stated that Thomas's speech was clear, organized and goal-directed, her manner was cooperative and responsive, her affect was somewhat blunted, and her mood appeared neutral. (R. at 496.) Thomas referred several times to anxiety problems. (R. at 496.) She was oriented to person, place, time and situation with no deficits in immediate or long-term memory, but slight impairment in working and short-term memory. (R. at 496.) Thomas made one error counting down from 30 to 20, and she stated she could not do serial 3s or 7s. (R. at 496.) Carusi noted that Thomas's overall fund of knowledge was less than expected given her educational attainment, and he said that her ability to think in abstract terms appeared below average. (R. at 496.)

Carusi stated that Thomas complained of low energy, difficulty sleeping, frequent worry, chronic irritability and social isolation. (R. at 496.) She denied suicidal thoughts or mania or psychosis. (R. at 496.) Carusi noted that Thomas appeared to exaggerate at times. (R. at 497.) He said that her results were considered questionable. (R. at 497.) Carusi diagnosed Thomas with dysthymic disorder; anxiety disorder, not otherwise specified; and borderline intellectual functioning. (R. at 497.) He placed her Global Assessment of Functioning[6], ("GAF"), score at 40.[7] (R. at 497.) Carusi stated that Thomas appeared able to understand and follow simple directions, but she would need assistance to understand moderately complex and more complex directions. (R. at 497.) He also said that her symptoms appeared to be of such severity as to impair her ability to get along adequately with others, to show up for work promptly and to handle work stressors appropriately. (R. at 497.)

On October 16, 2014, Thomas complained of worsened depression, worsened back pain and rib pain to Dr. Louthan. (R. at 571-75.) Dr. Louthan noted that Thomas was in no acute distress. (R. at 573.) He noted that his musculoskeletal exam revealed no visible abnormalities, normal lordosis, no scoliosis, no tenderness on palpation, full range of motion and no pain upon motion in any direction. (R. at 573.) He also noted all strength, tone, sensory and reflexes were within normal limits bilaterally. (R. at 573.)

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas …." DSM-IV at 32.

On October 20, 2014, state agency psychologist Eric Oritt, Ph.D., completed a Mental Residual Functional Capacity Assessment, indicating that Thomas had an unlimited ability to follow work rules. (R. at 94-96, 111-13.) Oritt found that Thomas was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. (R. at 94-96, 111-13.) He stated that Thomas's work-related mental abilities were not otherwise significantly limited. (R. at 94-96, 111-13.) Orrit said that Thomas should be able to learn, concentrate and persist and perform simple, routine tasks that did not require a great deal of interaction with others. (R. at 95-96, 112-13.)

On January 16, 2015, Thomas told Dr. Louthan that she was doing "poorly" with her anxiety and back pain. (R. at 565.) Dr. Louthan noted that Thomas was in no acute distress. (R. at 567.) Despite Thomas's complaints, Dr. Louthan noted that his musculoskeletal exam revealed no visible abnormalities, normal lordosis, no scoliosis, no spinal tenderness on palpation, full range of motion and no pain upon motion in any direction in her spine. (R. at 567.) He also noted all strength, tone, sensory and reflexes within normal limits bilaterally. (R. at 567-68.) Thomas saw Dr. Louthan again on March 16 and April 13, 2015, with similar complaints and findings. (R. at 555-64.) On July 9, 2015, Thomas stated that her depression and

energy level had improved since her last visit. (R. at 547.) In fact, Dr. Louthan noted that Thomas was then currently asymptomatic. (R. at 547.)

Oddly, on August 5, 2015, Dr. Louthan stated that Thomas was "being seen for an initial evaluation of back pain." (R. at 542.) He stated that the pain started one month earlier and was not related to any specific injury. (R. at 542.) Dr. Louthan noted that Thomas was in no acute distress. (R. at 544.) He noted that Thomas's thoracic spine was tender at the T4 level with painful flexion, extension, lateral flexion and rotation to the right and left. (R. at 544.) Thomas had full range of motion with no tenderness on palpation in her lumbar spine. (R. at 544.) Motor and sensory exams were normal with normal reflexes. (R. at 544.) X-rays of Thomas's thoracic spine, taken on August 5, 2015, showed no significant change, with mild degenerative disc disease in the mid to upper thoracic spine. (R. at 541.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011, West 2012 & 2018 Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion,

even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Thomas argues that substantial evidence does not exist in the record to support the ALJ's finding regarding her residual functional capacity. (Memorandum In Support Of Plaintiff's Request To Remand Back To The Social Security Administration, ("Plaintiff's Brief"), at 1, 10-18.) In particular, Thomas argues that the ALJ improperly rejected the opinions of Carusi and Dr. Louthan. (Plaintiff's Brief at 10-18.) The ALJ rejected Carusi's opinions because they were based upon Thomas's reported symptoms, despite the fact that Carusi noted evidence that Thomas was exaggerating her symptoms. (R. at 27.) In particular, Carusi assessed Thomas's GAF score at 40, which reflects serious impairment in reality testing or communication. There simply is no evidence contained in Carusi's narrative report or the entire record to support such a low GAF score. The ALJ also rejected Dr. Louthan's opinion contained on his assessment of Thomas's work-related abilities because they were vague and not supported by his examinations. (R. at 28.) In particular, Dr. Louthan stated only that Thomas has limitations in certain activities without stating what the limitations were. (R. at 492.) He also noted that Thomas suffered from "severe" back pain preventing her from working. Dr. Louthan's own reports do not support his opinion that Thomas suffered from disabling back pain. In particular, there is no record of Dr. Louthan performing any musculoskeletal examination of Thomas when he saw her the day before he completed the assessment. (R. at 487-90.) When Dr. Louthan saw Thomas in October 2014, his musculoskeletal exam revealed no visible abnormalities, normal lordosis, no scoliosis, no tenderness on palpation, full range of motion and no pain upon motion in any direction. (R. at 573.) He also noted all

strength, tone, sensory and reflexes were within normal limits bilaterally. (R. at 573.) This evidence does not support his assessment of Thomas's work-related abilities. Thus, based on my review of the record, I find that substantial evidence supports the ALJ's decision to give these opinions no weight. I further find that substantial evidence exists to support the ALJ's finding as to Thomas's residual functional capacity.

      An appropriate Order and Judgment will be entered.

      ENTERED: March 29, 2019.

      /s/ *Pamela Meade Sargent*
      UNITED STATES MAGISTRATE JUDGE